| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Prepare in ink or typewriter. Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. | FORM APPROVED OMB NO. 43-R0397 |
|---|---|---|

| 1. SUBMIT TO: | 2. NAME AND ADDRESS OF CLAIMANT (Number, street, city, State, and Zip Code) |
|---|---|
| See attachment. | See attachment. |

| 3. TYPE OF EMPLOYMENT | 4. AGE | 5. MARITAL STATUS | 6. NAME AND ADDRESS OF SPOUSE, IF ANY (Number, street, city, State, and Zip Code) |
|---|---|---|---|
| ☐ MILITARY<br>☐ CIVILIAN    n/a | Various | Various | Various; unknown. |

| 7. PLACE OF ACCIDENT (Give city or town and State; if outside city limits, indicate mileage or distance to nearest city or town) | 8. DATE AND DAY OF ACCIDENT | 9. TIME (A.M. OR P.M.) |
|---|---|---|
| Near the area of 20th Street, N.W. and I and K Streets, N.W., Washington, D.C. | Sat, April 15, 2000 | Afternoon |

| 10. | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|
| A. PROPERTY DAMAGE | B. PERSONAL INJURY | C. WRONGFUL DEATH | D. TOTAL |
| See attachment. | See attachment. | none | See attachment. |

11. DESCRIPTION OF ACCIDENT (State below, in detail, all known facts and circumstances attending the damage, injury, or death, identifying persons and property involved and the cause thereof)

See attachment.

**RECEIVED**

APR 1 2 2002

NATIONAL PARK SERVICE
NATIONAL CAPITAL REGION

| 12. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, street, city, State, and Zip Code)

n/a

BRIEFLY DESCRIBE KIND AND LOCATION OF PROPERTY AND NATURE AND EXTENT OF DAMAGE (See instructions on reverse side for method of substantiating claim)

n/a

| 13. | PERSONAL INJURY |
|---|---|

STATE NATURE AND EXTENT OF INJURY WHICH FORMS THE BASIS OF THIS CLAIM

See attachment.

| 14. | WITNESSES | |
|---|---|---|
| NAME | ADDRESS (Number, street, city, State, and Zip Code) |
| See attachment. | |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE ACCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 15. SIGNATURE OF CLAIMANT (This signature should be used in all future correspondence) | 16. DATE OF CLAIM |
|---|---|
| *[signature]* | April 12, 2002. |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant shall forfeit and pay to the United States the sum of $2,000, plus double the amount of damages sustained by the United States (See R.S. §3490, §418, 31 U.S.C. 231.) | Fine of not more than $10,000 or imprisonment for not more than 5 years or both. (See 62 Stat. 698, 749; 18 U.S.C. 287, 1001.) |

PS-106

STANDARD FORM 95 (Rev. 6-78)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.

A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 *et seq.*, 28 U.S.C. 2671 *et seq.*, 28 C.F.R. 14.3.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.

C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.

D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid".

## INSTRUCTIONS

### Complete all items—Insert the word NONE where applicable

Claims for damage to or for loss or destruction of property, or for personal injury, must be signed by the owner of the property damaged or lost or the injured person. If, by reason of death, other disability or for reasons deemed satisfactory by the Government, the foregoing requirement cannot be fulfilled, the claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with said claim establishing authority to act.

If claimant intends to file claim for both personal injury and property damage, claim for both must be shown in item 10 of this form. Separate claims for personal injury and property damage are not acceptable.

The amount claimed should be substantiated by competent evidence as follows:

*(a)* In support of claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

*(b)* In support of claims for damage to property which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

*(c)* In support of claims for damage to property which is not economically reparable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

Any further instructions or information necessary in the preparation of your claim will be furnished, upon request, by the office indicated in item #1 on the reverse side.

*(d)* Failure to completely execute this form or to supply the requested material within two years from the date the allegations accrued may render your claim "invalid".

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

17. DO YOU CARRY ACCIDENT INSURANCE? ☐ YES, IF YES, GIVE NAME AND ADDRESS OF INSURANCE COMPANY (*Number, street, city, State, and Zip Code*) AND POLICY NUMBER. ☐ NO

Some class members may carry accident insurance.

18. HAVE YOU FILED CLAIM ON YOUR INSURANCE CARRIER IN THIS INSTANCE, AND IF SO, IS IT FULL COVERAGE OR DEDUCTIBLE? | 19. IF DEDUCTIBLE, STATE AMOUNT

Unknown. | Unknown.

20. IF CLAIM HAS BEEN FILED WITH YOUR CARRIER, WHAT ACTION HAS YOUR INSURER TAKEN OR PROPOSES TO TAKE WITH REFERENCE TO YOUR CLAIM? (*It is necessary that you ascertain these facts.*)

Unknown.

21. DO YOU CARRY PUBLIC LIABILITY AND PROPERTY DAMAGE INSURANCE? ☐ YES, IF YES, GIVE NAME AND ADDRESS OF INSURANCE CARRIER (*Number, street, city, State, and Zip Code*) ☐ NO

Some class members may carry such insurance.

<u>Attachment to Standard Form 95 (FTCA Claim)</u>

**1. Submit to:**

a)  Bureau of Alcohol, Tobacco and Firearms
    Darlene Carr
    Safety Program
    650 Massachusetts Avenue, N.W. - Room 3140
    Washington, D.C. 20226

b)  Drug Enforcement Administration
    Betty Goldman
    Office of Chief Counsel
    2401 Jefferson Davis Highway
    Alexandria, VA  22301

c)  Federal Bureau of Investigation
    Larry R. Parkinson
    General Counsel
    FBI Headquarters
    935 Pennsylvanuia Avenue, N.W. - Room 7427
    Washington, D.C. 20535

d)  Federal Emergency Management Agency
    Andrea L. Williams
    FEMA Claims Manager
    500 C Street, S.W. - Room 529
    Washington, D.C. 20472

e)  National Park Service
    Vicky Keys
    Deputy Superintendent, NCPC
    900 Ohio Drive, S.W.
    Washington, D.C. 20242

f)  United States Capitol Police
    Bill Emory
    General Counsel
    119 D Street, N.E.
    Washington, D.C. 20510

g)  United States Secret Service
    John J. Kelleher
    Chief Counsel
    950 H Street, N.W.
    Washington, D.C. 20223

**2. Name and address of Claimants:**

Claimants are each of the plaintiffs (both natural persons and organizations) in the lawsuit entitled <u>Fifty Years Is Enough, et al. v. District of Columbia, et al.</u>, No. 01-CV-0811 (PLF) (D.D.C.), including each of the

approximately 600 to 700 members of the plaintiff class in that action, which is defined as "all persons who were detained and arrested on April 15, 2000, near the area of 20th Street, N.W. and I and K Streets, N.W., in connection with the protest against the Prison Industrial Complex during the IMF/World Bank demonstrations." The name and address of each of the individual claimants is set out in the caption to the Amended Complaint filed in that case, which is attached hereto and incorporated herein by reference.  However, this claim excludes any plaintiffs who have filed, or do file, individual FTCA claims on their own behalf.

    For purposes of this claim, please address all Claimants in care of their counsel, who are:

Arthur B. Spitzer, Esq.
American Civil Liberties Union
1400 20th Street, N.W. #119
Washington, D.C. 20036

Mara Verheyden-Hilliard, Esq.
Carl Messineo, Esq.
Zachary Wolfe, Esq.
Partnership for Civil Justice, Inc.
1901 Pennsylvania Ave., N.W. #607
Washington, D.C. 20006

Daniel M. Schember, Esq.
Gaffney & Schember
1666 Connecticut Avenue, N.W. # 225
Washington, D.C.  20009

James R. Klimaski, Esq.
Klimaski & Grill
1400 K Street, N.W. #1000
Washington, D.C. 20005

    Please note that the district court has not yet ruled on plaintiffs' pending motion for class certification, and plaintiffs' counsel therefore do not yet know the identities of the class members.  If the class is certified, counsel will provide the names and addresses of individual class members when they are able.

10. **Amount of Claim:**

    **A) Property Damage:**

    1.  Fifty Years is Enough, deprivation of materials needed for fundraising (see Complaint ¶¶ 75, 76), $500,000.

    2.  Mobilization for Global Justice, deprivation of real property and materials needed for fundraising (see Complaint ¶¶ 72, 75, 76), $1,000,000.

3. Alliance for Global Justice, deprivation of materials needed for fundraising (see Complaint ¶¶ 75, 76), $500,000.

4. Kimberly Grier, deprivation of personal property and materials needed for fundraising (see Complaint ¶¶ 13, 75, 76), $500,000.

5. Nadine Bloch, deprivation of materials needed for fundraising (see Complaint ¶¶ 12, 75, 76), $500,000.

6. Seeds of Peace, deprivation of property and food used to generate organizational goodwill and contributions fundraising (see Complant ¶¶ 74, 75, 76), $500,000.

7. Rob Fish, deprivation of property including video camera and tapes valuable for fundraising (see Complaint ¶¶ 16, 75, 76), $500,000.

8. Bette J. Hoover, deprivation of real property used for organizational business (see Complaint ¶ 14), $100,000.

SUBTOTAL: $3,600,000.

**B) Personal Injury:**

1. Rob Fish, assault and battery (baton beating) (see Complaint ¶¶ 16, 128), $750,000.

2. Nisha Anand, false arrest (see Complaint ¶ 11), $75,000.

3. Elizabeth Butler, false arrest (see Complaint ¶ 11), $75,000.

4. Adam Eidinger, assault and battery by chemical spray (see Complaint ¶ 15), $75,000.

5. Charles E. Sippel, assault, battery, false arrest/false imprisonment (stop and frisk) (see Complaint ¶ 18), $25,000.

6. Brian Edwards-Tiekert, assault and battery (baton beating breaking nose) (see Complaint ¶¶ 19, 129), $750,000.

7. Sasha Keller Wright, assault and battery (baton beating breaking nose and teeth) (see Complaint ¶¶ 20, 130), $750,000.

8.    Joseph Catron, assault and battery by chemical spray (see Complaint ¶¶ 21, 131), $75,000.

9.    Justin Jones, false arrest (see Complaint ¶ 22), $75,000.

SUBTOTAL: $2,650,000.

10.    Each class representative and class member, false arrest/false imprisonment/mistreatment while in custody April 15 (see Complaint ¶¶ 88-103), $250,000.

SUBTOTAL: $175,000,000 (approx.)

D) Total:

$181,250,000.

11. Description of Accident:

The various incidents and events giving rise to these claims are described in the Amended Complaint filed in <u>Fifty Years Is Enough, et al. v. District of Columbia, et al</u>., No. 01-CV-0811 (PLF) (D.D.C.), which is attached hereto and incorporated herein by reference.

Claimants believe, and have alleged in their lawsuit, that the federal agencies with which this claim is being filed conspired together with the D.C. Metropolitan Police Department to disrupt claimants' lawful political activities during the weekend of April 15-17, 2000, and that the events giving rise to the instant claims were part of that conspiracy.

13. Personal Injury: State Nature and Extent of Injury:

Claimants were injured in the following ways (although not every claimant was injured in each of the follwing ways): (a) they suffered loss of liberty and dignity and physical and emotional pain and distress; (b) they suffered substantial harm to their ability to convey their messages to the IMF-World Bank delegates and to the public; (c) some claimants suffered physical and emotional injury, pain and suffering, and related medical costs and expenses by reason of excessive force being used upon them; (d) some claimants suffered pecuniary loss when their property was seized and damaged or destroyed or not returned; (e) some plaintiffs suffered pecuniary loss because they were unable to sell or use for fund-raising the materials confiscated by the MPD, such as T-shirts and posters bearing political expressions.

**14. Witnesses:**

Various Claimants members are witnesses to the events involving other class members.  Additionally, various as-yet-unknown Metropolitan Police Department officers and officials and officers and officials of the ATF, DEA, FBI, FEMA, NPS, U.S. Capitol Police and Secret Service are witnesses to the events involving class members.

I.    **UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FIFTY YEARS IS ENOUGH                          )
1247 E Street, S.E.                                      )
Washington, D.C. 20003                            )
                                                                    )
MOBILIZATION FOR GLOBAL                 )        Case no.    _Ol- CV- 08ll (PLF)_
            JUSTICE, L.L.C.                             )
1247 E Street, S.E.                                      )
Washington, D.C. 20003                            )
                                                                    )
ALLIANCE FOR GLOBAL JUSTICE           )
1247 E Street, S.E.                                      )        JURY TRIAL DEMANDED
Washington, D.C. 20003                            )
                                                                    )
INTERNATIONAL ACTION CENTER         )
39 West 14th Street                                    )
Suite 206                                                   )
New York, NY 10011                          )
                                                                    )
SEEDS OF PEACE, INC.                            )
                                                                    )
Nisha M. Anand                                         )
255 18th Street                                   )
Apt. 406                                                    )
Brooklyn, NY 11215                                 )
                                                                    )
Elizabeth T. Butler                                    )
3116 18th St. NW                                      )
Washington, DC 20010                             )
                                                                    )
Kimberly Grier                                          )
H.C. 35, Box 205                                      )
South Gouldsboro, ME 040607               )
                                                                    )
Robert Fish                                                )
42 Acorn Street                                         )
Stanhope, NJ 07874                                  )
                                                                    )
Brian Edwards-Tiekert                             )
130 Beach Avenue                                     )
Mamaraneck, NY 10543                           )
                                                                    )
Sasha Keller Wright                                  )
3066 Maple Avenue                                  )
Oakland, CA 94602                                  )
                                                                    )
Joseph Catron                                           )
2216 Portsmouth St.                                  )
Hopewell, VA 23860                                )

1

Justin Jones
1111 Army Navy Drive
#1027
Arlington, VA 22202

Nadine Bloch
405 Beach Avenue
Takoma Park, MD 20912

Bette J. Hoover
626 Quebec Place N.W.
Washington, DC 20010

Martin F. Thomas
1640 Hobart Street N.W.
Washington, D.C. 20009

Charles E. Sippel
1006 M Street N.W.
Washington, DC 20001

Adam R. Eidinger
1858 Mintwood Place N.W.
Apt. #4
Washington, DC 20009

CLASS REPRESENTATIVES

Brian Becker
355 8th Avenue
Apt. 9D
New York, NY 10001

Lawrence Holmes
305 West 19th Street
Apt. 2
New York, NY 10011

James Erich Keller
8719 Contee Road
Apt. #102
Laurel, MD 20708

Patricia Doyle Mohammadi
3206 Wisconsin Ave. NW
Washington, DC 20016

Mitra Mohammadi
by and through her guardian
Patricia Doyle Mohammadi

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

2

3206 Wisconsin Ave. NW                                      )
Washington, DC 20016                                        )
                                                            )
Steven R. Olson                                             )
960 Fell Street N.W.                                        )
Baltimore, MD 21231                          )
                                                            )
Heather A. Chaplin                                          )
25 Highland Avenue                                          )
Metuchen, NJ 08840                                          )
                                                            )
Ann Flener                                                  )
329 Oakville Drive                                          )
Pittsburgh, PA 15220                                        )
                                                            )
Isaac Henry Gittlen                                         )
2 Harrogate Dr.                                             )
Hummelstown, PA 17036                                       )
                                                            )
Carl Dillinger                                              )
38 Locust Dr.                                               )
Elizabethtown, PA 17022                                     )
                                                            )
Marsha Kay Dillinger                         )
38 Locust Dr.                                               )
Elizabethtown, PA 17022                                     )
                                                            )
on behalf of themselves and all others                      )
similarly situated                                          )
                                                            )
              Plaintiffs,                                   )
                                                            )
                    v.                                      )
                                                            )
District of Columbia                                        )
441 4th Street                                              )
Washington, D.C. 20001                                      )
                                                            )
Charles H. Ramsey, individually and in his                 )
official capacity as,                                       )
Chief                                                       )
District of Columbia Metropolitan                           )
Police Department                                           )
300 Indiana Avenue, N.W.                                    )
Washington, D.C. 20001                                      )
                                                            )
Terrance W. Gainer, individually and in his                )
official capacity as,                                       )
Executive Assistant Chief for Operations                    )
District of Columbia Metropolitan                           )
Police Department                                           )

3

300 Indiana Avenue, N.W.                          )
Washington, D.C. 20001                           )
                                                 )
Unknown Officers of the District of              )
Columbia Metropolitan Police          )
Department, in their individual                  )
capacities                                       )
                                                 )
The United States of America          )
                                                 )
Bradley A. Buckles, in official capacity as      )
Director                                         )
Bureau of Alcohol, Tobacco and Firearms       )
650 Massachusetts Avenue, NW                     )
Washington, D.C. 20226                           )
                                                 )
Donnie R. Marshall, in official capacity as      )
Administrator                                    )
Drug Enforcement Administration                  )
700 Army Navy Drive                   )
Arlington, VA 22202                              )
                                                 )
Louis J. Freeh, in official capacity as  )
Director                                         )
Federal Bureau of Investigation                  )
935 Pennsylvania Avenue, N.W.                    )
Washington, D.C. 20535                           )
                                                 )
James Lee Witt, in official capacity as )
Director                                         )
Federal Emergency Management Agency              )
500 C Street, SW                                 )
Washington, D.C. 20472                           )
                                                 )
Denis Galvin, in official capacity as            )
Acting Director                                  )
National Park Service                 )
1849 C Street, NW                                )
Washington, D.C. 20240                           )
                                                 )
James J. Varey, in official capacity as )
Chief                                            )
United States Capitol Police                     )
119 D Street, NE                                 )
Washington, D.C. 20510                           )
                                                 )
Brian L. Stafford, in official capacity as       )
Director                                         )
United States Secret Service                     )
950 H Street, NW                                 )
Washington, D.C. 20373                           )

| | |
|---|---|
| Unknown Federal Agents, in their individual capacities | ) ) ) |
| Defendants. | ) ) ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES
### (First, Fourth, and Fifth Amendments: Seizure of Meeting House, Seizure of Writings and Means of Expression, False Arrest, Lengthy and Harsh Detention, Unreasonable Closure of Streets, Pop-Up Police Lines, Deployment of Agent Provocateur, Excessive Force; Common Law: False Arrest, Assault and Battery)

### Introduction

1.   This lawsuit addresses the unlawful and unconstitutional conduct of the District of Columbia and federal governments during the IMF - World Bank protests in April, 2000.

2.   Defendants planned and implemented a strategy to disrupt plaintiffs' exercise of First Amendment rights to speak and assemble. In furtherance of this unconstitutional disruption strategy, defendants prevented protesters from demonstrating near the IMF - World Bank meetings; preemptively arrested hundreds of persons, including plaintiffs, journalists and tourists, without cause and held them in plastic handcuffs for many hours without food, water or access to bathrooms; closed plaintiffs' Convergence Center on pretext; seized, confiscated and refused to release thousands of pieces of plaintiffs' political literature, signs, banners, puppets and related property and items; harassed and intimidated plaintiffs; deployed unwarranted "pop-up police lines"; deployed an agent provocateur; disseminated misinformation falsely portraying plaintiffs as violent; and used excessive force and brutality against non-violent demonstrators.

3.   This lawsuit seeks money damages for people whose rights were violated, and declaratory and injunctive relief prohibiting the government from interfering with future protests.

### JURISDICTION

4.   This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367.

5.   Venue is properly laid in this District pursuant to 28 U.S.C. § 1391(e).

5

## PARTIES

Plaintiffs

6.    Plaintiff "Fifty Years Is Enough," headquartered in Washington, D.C., is an unincorporated coalition of 205 organizations dedicated to the transformation of the World Bank and the IMF. Plaintiff Fifty Years is Enough was formed in 1994, on the 50th Anniversary of the founding of the World Bank, and has organized, engaged in, and advocated lawful political demonstrations at the site of the IMF - World Bank annual meetings each year since 1996, including during April, 2000, and on other intermittent occasions. It neither advocated nor engaged in any unlawful acts.

7.    Plaintiff International Action Center (IAC), headquartered in New York City with offices in Los Angeles and San Francisco, is an unincorporated political association opposed to racism and war. Plaintiffs Brian Becker and Lawrence Holmes are the Coordinators of the IAC. Plaintiffs IAC, Becker and Holmes advocated and organized lawful speech and assembly April 15, 2000 against the existence in our country of a "prison-industrial complex," against the continued incarceration and threatened execution of Mumia Abu-Jamal, and in opposition to the death penalty. Plaintiffs Becker and Holmes were wrongfully arrested and subject to preventative detention on April 15, 2000 when defendants executed a preemptive mass arrest of over six hundred persons in a sweep containing persons peacefully and lawfully assembled.

8.    Plaintiff Alliance for Global Justice (AGJ), headquartered and incorporated in Washington, D.C., is a 501(c)(3) non-profit corporation. AGJ is comprised of eight projects including the Nicaragua Network, the Latin America Emergency Response Network, the Campaign for Labor Rights, the Mexico Solidarity Network, 50 Years is Enough, the Chiapas Media Project, STITCH, and the Action for Community and Ecology in the Rainforests of Central America. AGJ organized and engaged in demonstration activities related to the IMF - World Bank, Spring 2000 meetings.

6

9.      Plaintiff Mobilization for Global Justice, LLC (Mobilization or MGJ), incorporated in
Washington, D.C., is a political coalition endorsed and sponsored by over four hundred
entities, and which was formed for the purpose of organizing protest activities related to the
April, 2000 IMF - World Bank meetings. MGJ organized and engaged in such
demonstrations in April, 2000 at the location of the IMF - World Bank meetings. MGJ had
plaintiffs' headquarters, known as the "Convergence Center," located at 1328 Florida
Avenue, N.W., Washington, D.C.

10.     Seeds of Peace is a non-profit organization incorporated in California and Arizona that
advocates protection of the environment and opposes weapons of mass destruction. Seeds
of Peace provided support to demonstrators on and about April 16 and 17, 2000 by
providing food preparation and food services. Plaintiff Seeds of Peace was deprived of
food stuffs and food preparation equipment when the MPD raided and seized the
Convergence Center and its contents on April 15, 2000. The MPD discredited Seeds of
Peace by falsely representing to the public that the food stuffs were in fact the makings of a
chemical weapon commonly called pepper spray.

11.     Plaintiffs Nisha Anand and Elizabeth Butler are political activists. Plaintiff Anand is a field
organizer for the War Resisters League. They advocated and organized lawful speech and
assembly in Washington, D.C. for the April 16 and 17, 2000 demonstrations against
policies of the World Bank and IMF. Plaintiffs Anand and Butler were wrongfully arrested
on April 15, 2000 when the defendants seized the Convergence Center and evicted all
persons inside. The charges on which they were arrested were later dropped.

12.     Plaintiff Nadine Bloch was a coordinator for Mobilization for Global Justice and worked
for months to create and supervise the creation of expressive materials in the form of
evocative papier mache puppets, banners, and flags of many types and sizes. The puppets
included caricatures of President Clinton, World Bank Chairman James Wolfensohn, and
other political figures.

7

13.   Plaintiff Kimberly Grier, a mosaic stoneworker and artist, came to Washington, D.C. to disseminate political and educational materials and artwork related to the dangers of biotechnology. Ms. Grier's political and educational materials, along with other belongings, were confiscated and damaged by the Metropolitan Police Department when they raided and seized the Convergence Center. Ms. Grier was deprived of hundreds of items including banners, t-shirts, posters, bumper stickers, literature, electronic media, and costumes that were politically expressive, in addition to personal items.

14.   Plaintiff Bette J. Hoover is the Director of the D.C. Peace and Economic Justice Program / American Friends Service Committee. Plaintiff Hoover provided assistance in organizing the April demonstrations by offering to provide housing for demonstrators from out of town, and assisting in arranging for a central Convergence Center for demonstrators. Plaintiff Hoover's office is located in a building adjacent and attached to the "Convergence Center."   Plaintiff Martin F. Thomas is a D.C. statehood activist and was at the time of these events a candidate for the position of Shadow Representative. Plaintiff Thomas assisted in organizing the April demonstrations and was the housing coordinator who sought to find shelter for persons arriving from out of town. Plaintiffs Hoover and Thomas were subjected to acts by the defendants intended to disrupt their organizational efforts on behalf of the demonstrators. Plaintiff Hoover was barred from using her office near the Convergence Center when the defendants evicted demonstrators from the Convergence Center and evicted all businesses and organizations that were located in the building next door. Plaintiff Thomas was subjected to surveillance, questioning, and interference and disruption by law enforcement officers in his activities to arrange housing for demonstrators arriving from out of town.

15.   Plaintiff Adam R. Eidinger was an organizer of the April demonstrations and a demonstrator. Plaintiff Eidinger was subjected to acts by the defendants intended to disrupt his organizational efforts on behalf of the demonstrators. Plaintiff Eidinger was also

subjected to the unreasonable use of pepper spray by defendants on April 17, 2000.

16.     Plaintiff Rob Fish was injured by excessive police force on April 17, 2000 when he was taking photographs of police misconduct against demonstrators. Plaintiff Fish was beaten over the head by an undercover officer wielding a baton as he was taking pictures. Another officer who was in uniform stomped on his camera. Plaintiff Fish's personal property, including video camera and videotapes, was confiscated and not returned when defendants seized the Convergence Center.

17.     Each of the aforementioned plaintiffs have immediate and concrete plans to organize recurring and future demonstrations and acts of lawful speech and assembly in Washington, D.C. against the policies of the World Bank and the IMF, and for other lawful political purposes.

18.     Plaintiff Charles E. Sippel, a resident of Washington, D.C., was an assistant to the Midnight Special Law Collective (MSLC) who provided support to demonstrators who were arrested and to their attorneys. Shortly before April 16, 2000, he was subjected to an unjustified stop, frisk and search by defendants. He was also questioned about his association with the head of the MSLC, about what his planned activities were, and was shown a photograph of himself.

19.     Plaintiff Brian Edwards-Tiekert, at the time a college student at Wesleyan University, was injured by excessive force on April 16, 2000 when he was standing passively with his arms linked through PVC piping with other demonstrators at the intersection of 21st and G Streets, NW. Police charged the nonviolent demonstrators, who were unable to shield themselves and whose arms were immobile. An officer of the MPD charged Mr. Edwards-Tiekert, smashing a baton into Mr. Edwards-Tiekert's face, breaking his nose.

20.     Plaintiff Sasha Keller Wright was injured by excessive force on April 16, 2000 when she was standing passively with her arms linked through PVC piping with other demonstrators, unable to shield herself. An officer of the MPD charged Ms. Wright,

9

smashing a baton into Ms. Wright's face, breaking her nose and teeth.

21. Plaintiff Joseph Catron, a student at the College of William and Mary, came to Washington, D.C. to demonstrate with Students for Environmental and Economic Justice. He was drenched with a chemical agent believed to be pepper spray as he stood before a battalion of officers with his hands and fingers outstretched, displaying a peace sign.

22. Plaintiff Justin Jones was at the time of these events a second year law student at The George Washington University and volunteer legal observer with the National Lawyers Guild. He was arrested without cause on April 17, 2000, when Defendants caused a "pop-up" police line to be deployed near the intersection of 17th and M Streets, NW.

23. Plaintiff James Erich Keller is a biochemist who served as a legal observer for the demonstrations. On April 15, 2000 Plaintiff Keller, who was prominently wearing a green hat and a badge identifying him as a legal observer, was arrested and detained without cause when defendants preemptively swept the area in a mass arrest of demonstrators and others who were within the vicinity of the demonstrators' speech and assembly.

24. Plaintiffs Patricia Doyle Mohammadi and her then 13-year-old daughter Mitra Mohammadi were arrested, separated and detained for eight or more hours without cause on April 15 at the IAC demonstration on 20th Street. Plaintiffs Mohammadis had sought to learn more about the demonstrations, and went to learn the views of the persons demonstrating against the prison-industrial complex as well as to videotape portions of the demonstrations that were occurring at that time. Plaintiffs Mohammadis were arrested without cause when defendants preemptively swept the area in a mass arrest of demonstrators and others who were within the vicinity of the demonstrators' speech and assembly.

25. Plaintiff Steve Olson was arrested April 15 at the IAC demonstration on 20th Street, N.W. As a producer for public access television, he had sought to inform the public about the demonstrations and the demonstrators' viewpoints. He was arrested and detained for over

eighteen hours without cause when defendants preemptively swept the area in a mass arrest of demonstrators and others who were within the vicinity of the demonstrators' speech and assembly.

26.    Plaintiff Heather Chaplin is a professional journalist who works as a senior writer for Fortune Small Business magazine. Ms. Chaplin was gathering information on the anti-globalization protest movement. She was arrested and jailed overnight when defendants preemptively swept the area in a mass arrest of demonstrators and others who were within the vicinity of the demonstrators' speech and assembly.

27.    Plaintiff Ann Flener is a Technician and National Rapid Response Coordinator with the United Steelworkers of America. Plaintiff Isaac "Ike" Henry Gittlem is President of Steelworkers Local Union 1688 and President of the Harrisburg Region Central Labor Council. Plaintiff Carl Dillinger is a union officer with the United Steelworkers of America and is married to plaintiff Marsha Kay Dillinger. Plaintiffs Flener, Gittlem, Dillinger and Dillinger were seeking to learn more about the demonstration against the Prison Industrial Complex when they were arrested and jailed when defendants preemptively swept the area in a mass arrest of demonstrators and others who were within the vicinity of demonstrators' speech and assembly.

Defendants

28.    Defendant District of Columbia encompasses all municipal officials and Agencies that had any role in the violations alleged herein.

29.    Defendant D.C. Metropolitan Police Department has law enforcement authority over the District of Columbia, and coordinated with federal and other law enforcement authorities on matters related to security in the District of Columbia during the April, 2000 meetings of the International Monetary Fund and World Bank and committed unlawful acts described herein.

30.    Defendant Charles Ramsey is Chief of the Metropolitan Police Department, and is

11

responsible in his official and individual capacity for unlawful acts described herein.

31.    Defendant Terrence Gainer is Executive Assistant Chief for Operations of the Metropolitan Police Department, and is responsible in his official and individual capacity for unlawful acts described herein.

32.    Defendants unknown officers of the District of Columbia Metropolitan Police Department committed unlawful acts described herein.

33.    Defendant United States of America encompasses all federal law enforcement or other officials and Agencies that had any role in the violations alleged herein.

34.    Defendant Bureau of Alcohol, Tobacco and Firearms participated in the deployment and coordination of law enforcement during the meetings of the International Monetary Fund and World Bank in April, 2000 and committed unlawful acts described herein.

35.    Defendant Drug Enforcement Administration participated in the deployment and coordination of law enforcement during the meetings of the International Monetary Fund and World Bank in April, 2000 and committed unlawful acts described herein.

36.    Defendant Federal Bureau of Investigation participated in the deployment and coordination of law enforcement during the meetings of the International Monetary Fund and World Bank in April, 2000 and committed unlawful acts described herein.

37.    Defendant Federal Emergency Management Agency participated in the deployment and coordination of law enforcement during the meetings of the International Monetary Fund and World Bank in April, 2000 and committed unlawful acts described herein.

38.    Defendant National Park Service participated in the deployment and coordination of law enforcement during the meetings of the International Monetary Fund and World Bank in April, 2000 and committed unlawful acts described herein.

39.    Defendant United States Capitol Police participated in the deployment and coordination of law enforcement during the meetings of the International Monetary Fund and World Bank in April, 2000 and committed unlawful acts described herein.

40.    Defendant U.S. Secret Service participated in the deployment and coordination of law enforcement during the meetings of the International Monetary Fund and World Bank in April, 2000 and committed unlawful acts described herein.

41.    Defendant unknown federal agents committed unlawful acts described herein.

### FACTSPlaintiffs Were in Washington, D.C. to Engage in Constitutionally Protected Activities

42.    Each year since 1996, including the year 2000, plaintiff "Fifty Years is Enough" has protested outside the annual meetings of the International Monetary Fund and World Bank in Washington, D.C. Its actions have always been lawful.

43.    The Spring 2000 Meetings of the IMF/World Bank were scheduled to take place on Sunday, April 16, 2000 and Monday, April 17, 2000.

44.    Thousands of individuals and many organizations and plaintiffs, including plaintiff Fifty Years is Enough, intended to protest outside these meetings in a lawful and constitutionally protected manner.

45.    Some other individuals and groups announced their intention to engage in non-violent civil disobedience and to block the meeting participants' vehicular route. These groups made it clear that they would act in a strictly non-violent manner.

46.    Plaintiffs did not engage or intend to engage in any violence and defendants had no reasonable basis for expecting that they would do so. Further, defendants had no reasonable basis for expecting any violence by anyone against IMF or World Bank officials or other persons.

47.    Principles of non-violence were set forth in plaintiff Mobilization for Global Justice's literature concerning the April 16th and 17th demonstrations:

"All participants in this particular action are asked to agree to these action guidelines. Having this basic agreement allows people from many backgrounds, movements, and beliefs to work together. They are not philosophical or political requirements or judgments about the validity of some tactics over others. These guidelines are basic agreements that create a basis for trust so that we can work together

13

for this action and know what to expect from each other.

**1 )  We will use no violence, physical or verbal, towards any person**
**2 )  We will carry no weapons**
**3 )  We will not bring or use any alcohol or illegal drugs**
**4 )  We will not destroy property"**
("Action Guidelines," emphasis in original)

48.  The "Action Guidelines," quoted above, were known to defendants.

49.   Defendants possessed and exchanged with each other substantial, almost comprehensive, knowledge about plaintiffs and the anticipated protest activities related to the IMF - World Bank Spring, 2000 meetings.

50.  The Mobilization for Global Justice was an open and public association.

51.  The Mobilization maintained an Internet web site at which its plans were posted for all to see. Other demonstration organizers likewise maintained web sites. Defendants monitored the web sites of the Mobilization and of other demonstration organizers.

52.  Defendants monitored the public e-mail communications of demonstration organizers.

53.  Defendants infiltrated plaintiffs' organizations through the use of undercover agents posing as protesters or other civilians.

54.  Defendants took photographs and video recordings of plaintiffs engaged in lawful political activity.

55.  The government defendants subjected protesters to surveillance outside of Washington, D.C.

56.  Defendants knew or should have known that there was no reason to anticipate any violence on the part of any plaintiff, and no reason to anticipate any violence by anyone against World Bank - IMF meeting participants or any other persons.

### Defendants' Intentional Strategy of Disruption

57.  Despite defendants' lack of any reasonable basis to anticipate violence against any person, policymakers of the defendants United States of America and District of Columbia planned

14

and implemented a strategy to disrupt plaintiffs' exercise of First Amendment rights to speak and assemble – by intimidation, harassment, dissemination of false information portraying plaintiffs as violent, street closures, pop-up police lines, confiscation of political and expressive materials, closing of demonstrators' meeting center, deployment of an agent provocateur, preemptive mass false arrests and seizures, use of excessive force, and unnecessary lengthy detention of arrestees in inhumane conditions.

58. In furtherance of this disruption strategy, defendants engaged in a series of overt acts, some of which were unconstitutional and independently actionable.

59. Defendants stopped and frisked individual protesters without reasonable suspicion or consent.

60. Agents of the defendants searched demonstration organizers or their vehicles without probable cause or consent, and made pretextual visits to their places of residence. They stopped demonstration organizers on the street, showed them photos which had been taken of them, named persons with whom the activists were associated, and otherwise made it known to them that the government was watching them.

61. Large numbers of uniformed and non-uniformed officers congregated near and subjected to surveillance the Convergence Center and other places where activists met.

62. Agents posing as political activists infiltrated the demonstrators' organizations and informal groups.

63. Defendants conducted surveillance of law students and others working under the direction of attorneys, including approaching one such person as he approached a private apartment building immediately after delivering documents to attorneys for demonstrators at their law office, and addressing him by a formal legal name he does not use. These acts additionally were taken to disrupt litigation support by making him aware of this unjustified surveillance.

64. Demonstrators were subjected to questioning about their political affiliations and beliefs by

15

law enforcement officers, including Plaintiff Joseph Catron.

65.    Government helicopters flew and hovered at low altitudes over the Convergence Center and the residences and property of protesters.

66.    Defendants caused the George Washington University to ban overnight guests in its dormitories during the period of the protests and to prohibit demonstrators from using GWU facilities that had been promised to them; caused the American University to cancel an assembly and panel, which had included Presidential candidate Ralph Nader, who was scheduled to speak on globalization and the World Bank and the IMF; and caused the Washington Metropolitan Area Transit Authority both to close Metro stations that plaintiffs were expected to use (including Farragut West, located near the IMF), and to prohibit passengers from carrying political banners and signs attached to thin pieces of wood, which is customarily allowed.

### The Pretextual Closing of the Convergence Center and the Confiscation of Political Materials

67.    The Mobilization established its meeting house, or "Convergence Center" at 1328 Florida Avenue, N.W. The Mobilization used the Convergence Center as a place for meeting, exchanging political ideas, teaching techniques of non-violent civil disobedience, creating political signs, puppets and banners, and for the storage of tens of thousands of pieces of political material, including leaflets, newsletters, T-shirts, banners, evocative papier mache puppets representing political figures, buttons, circulars, posters and stickers.

68.    Plaintiffs' materials were political in nature. For example, plaintiffs' literature confiscated by defendants stated:

a.     "The $2.5 trillion international debt, owed mostly to multinational banks, is a crushing burden on all working people. To pay the debt, countries are forced by the IMF to privatize their industries, slash social services, reduce wages and orient their economies for export..."

16

b. "Women, who make up 70% of the world's poor, have been disproportionately affected by IMF and World Bank policies. As governments are forced to cut social spending under the Structural Adjustment Programs (SAPs), women have not only had their access to health care, education and other social services severely cut but they have also had their burden as care-givers and community service providers increased."

c. "IMF/World Bank policies drive down wages and weaken unions by making it possible for corporations in countries like the U.S. to use the constant threat of moving overseas to force people to accept reduced wages and sacrifice environmental protections."

69. Plaintiff Grier's posters, bumper stickers, t-shirts and other expressive materials were political in nature and displayed statements "genetically engineered corn kills monarch butterflies, what next;" "biotechnology giving pollution a life of its own" with the image of small flowers with biohazard signs; and "genetically engineered frankenfoods untested, unlabeled and in your next meal," among other statements and images.

70. The protesters had assembled at the Convergence Center for approximately two weeks prior to April 15, during which time the defendants used extensive surveillance, including the use of undercover agents, to enter and observe the activities and conditions within the Convergence Center.

71. On Saturday, April 15, 2000, many protesters from out of town were scheduled to arrive at the Convergence Center in anticipation of the following days' political demonstrations.

72. At approximately 8:30 a.m. on April 15th, the D.C. Metropolitan Police Department and the D.C. Fire Department raided the Convergence Center. They declared the site to be in violation of the fire code, evicted all persons who were there, and sealed the doors.

73. Defendants refused to allow the removal of plaintiffs' political materials and their personal belongings, including food, clothing and medicine, although no fire hazard would have

17

been presented by permitting them to do so.

74. Defendants denied access by Plaintiff Seeds of Peace to the food and supplies they were storing in the Convergence Center to provide the demonstrators, disrupted their organizational efforts to provide food for the thousands of demonstrators, and confiscated, damaged and destroyed property, food and tools.

75. These acts unconstitutionally deprived use of political materials owned by Plaintiffs Grier, Bloch, 50 Years Is Enough, Mobilization for Global Justice, Alliance for Global Justice, and others.

76. These acts also disrupted and deprived plaintiffs of the ability to use these materials to raise funds.

77. Defendants also confiscated and denied access to plaintiffs the use of their bicycles which disrupted plaintiffs' ability to transport political materials and engage in constitutionally protected assembly and expressive speech.

78. By Saturday evening, attorneys for the protesters had arranged for an emergency hearing at 8:30 a.m. on Sunday, April 16, before United States District Judge Thomas Hogan, in which they intended to present their claims that the raid and confiscation had violated the protesters' constitutional rights. In exchange for cancellation of that hearing, at approximately 2:00 a.m. on April 16, the District of Columbia entered into a written agreement to allow the protestors to retrieve their materials at 7:00 a.m. on April 16 with the assistance of District officers.

79. However, when the protesters arrived with trucks at the appointed time, agents of the District of Columbia refused to assist in the removal of items, refused to allow the plaintiffs to remove their political literature and property, delayed, and threatened to arrest plaintiffs and their lawyer.

80. The District of Columbia kept the Convergence Center closed and refused to release the confiscated materials until after the demonstrations had ended. When released, much of the

confiscated property was damaged. Other confiscated property was missing. Video equipment, including video tapes of police misconduct, were never returned.

81.   The above actions were taken as a matter of District of Columbia policy and were ratified and approved by policymakers of the District of Columbia, including MPD Chief Charles Ramsey and the Office of Corporation Counsel.

82.   The raid on the Convergence Center was pretextual, and would not have occurred but for defendants' desire to disrupt plaintiffs' demonstration activities. The raid and refusal to return related materials was timed to cause maximum disruption of the demonstration, and had the purpose and effect of depriving plaintiffs of their First Amendment rights to free speech and assembly within the Convergence Center and to create, possess and use the First Amendment protected materials as part of their demonstration activities.

### Dissemination by the District of Columbia of Misinformation and Inaccurate Information Casting The Mobilization and Plaintiffs As Violent

83.   The District of Columbia publicly disseminated false information casting the Mobilization and other plaintiffs as violent.

84.   After illegally seizing and searching the Convergence Center, the District of Columbia announced to the media that it had confiscated the makings of pepper spray. The District later conceded that the "pepper spray" was in fact peppers, onions and other vegetables found in a kitchen area.  This mischaracterization discredited Plaintiff Seeds of Peace, which had provided food for the demonstrators as a act of support of their political messages.

85.   The District of Columbia announced to the media that it had found a Molotov cocktail inside the Convergence Center. The District later conceded that the "molotov cocktail" was in fact a plastic soda bottle containing rags.

86.   After a raid on an activists' residence, the District of Columbia announced that it had confiscated an undisclosed amount of ammunition. The District later conceded that that

statement was false.

87.  These examples of dissemination of false information by defendants were part of their effort to disrupt plaintiffs, to discredit plaintiffs, to justify defendants' actions in interfering with the demonstrations, and to portray plaintiffs as violent in order to discourage participation in the demonstrations.

## The April 15, 2000
## Mass False Arrest

88.  On April 15, 2000, several hundred demonstrators, including plaintiffs IAC, Becker and Holmes assembled without violence at the United States Department of Justice to protest the Prison Industrial Complex pursuant to a permit issued to plaintiff International Action Center.

89.  After a rally, the demonstrators walked west from the Department of Justice. Police escorted the demonstrators and advised them that they did not need a permit as long as they remained on the sidewalk, which they did.

90.  Plaintiff IAC informed the MPD that they wished to walk to Dupont Circle from which location they would disperse.

91.  Metropolitan Police Department officials directed the demonstrators to proceed up 20th Street to Dupont Circle for that purpose. However, as plaintiffs moved up 20th Street, police in riot gear surrounded the procession, preventing movement or dispersal.

92.  Before trapping the procession, the police did not order plaintiffs to disperse.

93.  After blocking the procession, the police did not allow plaintiffs to disperse even when individuals asked to be allowed to leave. The police imprisoned the people who had been caught in their trap for over an hour. This included not only peaceful protesters, but also journalists displaying press credentials, passers-by who had been attracted by the protesters' message, and unknowing tourists and others who were in the area only by coincidence.

94.   The police then arrested substantially everyone they had caught in their trap, including lawful demonstrators, bystanders, journalists and tourists. More than 600 people were arrested.

95.   These arrests – which took place before the IMF - World Bank meetings and protests – were made in order to make it difficult and frightening for the arrested individuals to participate in the demonstrations in the following two days, and to discourage others from participating in or observing those demonstrations by signaling to them that they were likely to be arrested even if they did not break the law.

96.   During these arrests law enforcement took video footage of demonstrators from the ground level and from nearby rooftops. Law enforcement also used these arrests to collect information on demonstrators including identification, photographs, fingerprints and other information and to compile records on lawful demonstrators.

97.   The class of individuals arrested at the Prison Industrial Complex protest, which is composed of approximately 600 - 700 members, is too numerous for joinder.

98.   These individuals' claims that their First and Fourth Amendment rights and their common law rights against false arrest and false imprisonment were violated raise common questions of law and fact.

99.   By arresting virtually all of the participants in, and onlookers at, a peaceful demonstration without lawful justification, defendants acted on grounds generally applicable to the class.

100.  The claims of the named plaintiffs are typical of the claims of this class, as they were lawfully present in downtown Washington, D.C. when they were arrested without basis on April 15 as part of the same police sweep.

101.  The named plaintiffs will fairly and adequately represent the interests of the members of this class.

102.  The arrestees were held in harsh conditions. They were restrained in plastic handcuffs that inflicted pain, discomfort and distress. Arrestees were confined on buses and denied food

21

and water, in some cases for as long as 18 hours or more. Arrestees were denied use of a bathroom for hours, causing discomfort and humiliation. Arrestees were denied use of lawfully dispensed prescription medications for pre-existing conditions. Arrestees were denied use of a telephone to contact family members or attorneys.

103.    Metropolitan Police Department officers deliberately misinformed arrestees of their rights, falsely stating that they would be detained, in some instances for days, unless they posted and forfeited fifty dollars. Defendants did not advise plaintiffs of the option to post fifty dollars and appear at a hearing to contest the arrest. As a result, arrestees can not be deemed to have knowingly waived any rights when they posted and forfeited.

### The Creation and Maintenance of An Overbroad Exclusion Zone

104.    Defendants created and maintained an enormous Exclusion Zone that insulated the World Bank and the International Monetary Fund from protest, and prevented demonstrators from having their political expressions be heard and seen by those within those buildings.

105.    The Exclusion Zone encompassed at least fifty blocks and included Lafayette Park, parts of Pennsylvania Avenue, and other parkland, streets and sidewalks in downtown Washington, D.C. This zone was maintained until the night of April 17, 2000, after the demonstrations had ended.

106.    No demonstrators were permitted to enter the Exclusion Zone. The only persons allowed to enter the zone were persons who had been approved by the IMF and World Bank, certain media, and area employees and residents with identification.

107.    The Exclusion Zone was established as a matter of District of Columbia and U.S. Government policy and was ratified and approved by policymakers of the District of Columbia, including MPD Chief Charles Ramsey and Mayor Anthony Williams and by federal policymakers with control over the federal land within the zone.

108.    The Exclusion Zone was not narrowly tailored to serve the government's legitimate interests in the protection or persons and property and in ensuring free access to the IMF-

22

World Bank meetings delegates and others.

109. The Exclusion Zone did not leave open ample alternative channels for the communication of plaintiffs' political expressions to the persons congregating within the IMF building for the purposes of the IMF-World Bank annual meeting.

110. There was no lawful justification for the creation and maintenance of this Exclusion Zone. Defendants had no reasonable basis to expect violence against any person, and the defendants had adequate personnel and equipment on hand to permit the demonstrators to bring their protest within sight and sound of their intended audience, while still protecting the safety of persons and property and assuring that the IMF - World Bank meetings could proceed.

### Deployment of pop-up police lines

111. Defendant MPD closed streets and sidewalks without lawful authority and arrested demonstrators who were within the newly closed areas, which could "pop up" without notice or justification.

112. On April 17, 2000, demonstrators assembled and walked throughout the downtown area, outside the vast "no-protest" area encompassing many blocks around the IMF and World Bank and downtown Washington, D.C.. They carried signs and chanted slogans critical of the policies of the IMF and World Bank. Many of these demonstrators were members of or associated with the organizational Plaintiffs.

113. Beginning at approximately 8:30 a.m., Defendant MPD repeatedly deployed many groups of "pop-up police lines" throughout the downtown area, including near in the intersection of 18th and K Streets, near Farragut Square Park, near Dupont Circle and near the intersection of 17th and M Streets. The deployment of these pop-up police lines was custom, practice and policy of Defendants.

114. Many MPD officers in these mobile police lines failed to display badges or identification name plate bars.

23

115.   MPD caused some of these police lines to converge, trapping dozens of demonstrators between lines of police officers. MPD then arrested these demonstrators without probable cause and in violation of their First and Fourth Amendment rights.

116.   One such arrest occurred near the intersection of 17th and M Streets – some five blocks from the IMF and World Bank and well outside the "no-protest zone." The group of demonstrators had been peaceful and lawful. There was no probable cause for their arrest, which was in violation of their First and Fourth Amendment rights.

117.   One of the individuals arrested was Plaintiff Justin Jones, who was a second year law student at the George Washington University and was volunteering as a legal observer with the National Lawyers Guild. Plaintiff Jones had conscientiously observed all traffic regulations and other laws, and had committed no crime.

118.   Other police lines throughout downtown Washington sealed off sidewalks and other traditional public fora in violation of the First Amendment.

119.   Without cause, MPD directed police lines to move forward against gatherings of peaceful demonstrators. MPD officers struck forward with their batons in a violent gesture and otherwise threatened bodily harm, apparently as part of an unconstitutional effort to clear some vague and undefined portion of the sidewalk.

120.   The use of police lines, arbitrarily established and at times mobile, vaguely, arbitrarily and capriciously created unconstitutional no-protest zones on public sidewalks. These zones were unconstitutional restraints on speech and assembly and were unconstitutionally vague.

121.   In some cases, demonstrators would flee away from mobile police lines, only to find they were trapped by another set of police lines at the opposite end of the block and were consequently unlawfully detained, seized and arrested and were not free to leave.

122.   A line of MPD officers near Farragut Square park displayed large canisters of pepper spray. Demonstrators who approached to ask to where they could disperse were threatened

with pepper spray or batons.

123. This detainment between mobile police lines violated the demonstrators' First and Fourth Amendment rights.

### Agent Provocateur

124. An April 17, 2000, Defendants deployed an agent dressed as a demonstrator, carrying a flag on a flag pole, who incited demonstrators to violence and to join him in acts of property destruction. When the demonstrators refused to take any such acts, the agent sprayed demonstrators near the intersection of 18th and K Streets with a chemical agent believed to be pepper spray.

125. These acts had the purpose and effect of creating a disruption of the lawful political speech of the demonstrators and undermining the non-violent free speech and associational events organized by the Plaintiff organizations, in violation of the First Amendment.

126. It is the custom, practice and policy of Defendants to use agents provocateurs to disrupt and discredit political demonstrators.

### Excessive Use of Force and Threats of Excessive Force

127. On April 16 and 17, 2000, officers and agents of the District of Columbia, as well as federal officers, subjected individuals to excessive force, and attempts to use excessive force, including knocking, tripping or throwing to the ground; beatings with batons; spraying and dousing with chemical irritants including use of tear gas and pepper spray; running over with motorcycles; driving a van rapidly into demonstrators; donning gas masks and pointing gas cannister guns; and using motorcycles, vans, cars and horses as weapons.

128. On April 17, 2000 plaintiff Rob Fish, who was taking photographs of police brutality, was beaten over the head with a baton by an unidentified undercover agent. He was able to take a photo of the agent swinging the baton towards his head. After the camera dropped to the ground during the beating, an officer stomped on the camera. The damage to the camera

destroyed some photos, but the photo of the undercover agent was salvaged.

129. On April 16, 2000, an officer of the MPD charged Plaintiff Brian Edwards-Tiekert when he was standing passively with his arms linked through PVC piping with other demonstrators at the intersection of 21st and G Streets, NW., smashing a baton into his face, breaking his nose.

130. Plaintiff Wright was injured by excessive force on April 16, 2000 when she was standing passively with her arms linked through PVC piping with other demonstrators, unable to shield herself. An officer of the MPD charged Ms. Wright, smashing a baton into Ms. Wright's face, breaking her nose and teeth.

131. On April 17, 2000 Plaintiff Catron was drenched by defendants with a chemical agent believed to be pepper spray as he stood before a battalion of officers with his hands and fingers outstretched, displaying a peace sign, near the intersection of 20th Street and Pennsylvania Avenue, N.W.

132. For example, on April 17, 2000, MPD officers violently attacked peaceful demonstrators and others at the intersection of 15th Street and Pennsylvania Avenue. Some of the demonstrators were members of or affiliated with organizational plaintiffs. Law enforcement had previously closed the street to traffic and deployed a metal barrier in the street. Demonstrators were peacefully sitting with their backs to the metal barrier, displaying signs, making speeches and signing songs with political messages. Other demonstrators, members of the press, observers and passers by were nearby.

133. Without warning or order to disperse, MPD officers in riot gear raced toward the line of peaceful demonstrators accompanied by other MPD officers on motorcycles who struck at members of the press, observers and passers by. The MPD officers in riot gear on foot attacked the peaceful demonstrators by clubbing them with their batons, throwing them to the ground, kicking them, beating them with their fists, and otherwise assaulting them. Officers would act in teams with one officer grabbing and pulling a demonstrator to his or

her feet while other officers would strike the demonstrators with the batons and beat them back to the ground.

134.    Demonstrators were beaten in the head as MPD officers wielded their batons with evident force.  One officer repeatedly raised his arm back behind his head so he could bring his baton down upon demonstrators with full force.  This attack injured demonstrators and at least one journalist with the Associated Press, who was left lying on the pavement in a pool of blood that streamed from his head.

135.    Even after being assaulted by the MPD, the demonstrators remained non-violent.

136.    The use of such violence, in this and other instances, violated the First Amendment rights of all plaintiffs and all demonstrators.

137.    The use of excessive force against plaintiffs was caused and ratified by District of Columbia and federal policymaking officials. Through their training and indoctrination of D.C. police officers in preparation for the April 16 and 17 demonstrations, D.C. policymaking officials fostered the belief that the demonstrators would likely be violent; that the demonstrators had committed prior acts of violence in Seattle; that the disruption of the demonstrators was a legitimate police goal; that harassment and intimidation of the demonstrators were legitimate police tactics; and that unlawful conduct and excessive force by officers against demonstrators and those assembling near or with them (such as journalists) would be tolerated and not investigated.

138.    District and federal policymakers also fostered the belief by officers that excessive force against demonstrators would be tolerated and not investigated by approving of the officers' widespread practice of removing or obscuring their badges and name tags. They also fostered this belief by failing on April 16 to investigate or take other appropriate corrective action in response to reports of police excessive force, thus encouraging additional brutality the next day. Chief Ramsey ratified the use of excessive force including by stating, after the demonstrations, that he would make "no apologies" for any conduct of his officers.

27

139.   Excessive use of force by law enforcement officers on April 16 and 17 was so common
       and widespread as to support an inference that it would not have occurred absent toleration
       by the District and federal governments. Subsequent to April 16 and 17, District and federal
       policymakers asserted that the officers had acted properly on those days, thus ratifying their
       unlawful acts.

### Further evidence of Defendants' Intent to Disrupt
### Plaintiffs' Exercise of First Amendment Rights

140.   Several statements and actions by defendants manifested their intent to disrupt, diminish,
       deter, and prevent lawful speech and assembly.

141.   Terrence W. Gainer, Executive Assistant Chief of Police, D.C. Metropolitan Police
       Department said, "we started licking our chops" when defendants learned of the possibility
       that there were fire code violations at the Convergence Center. Assistant Chief Gainer
       explained "It would be helpful to us if we discombobulated the protesters."

142.   District policymaker MPD Chief Charles Ramsey stated that the reason he allowed the
       return of some of MGJ's puppets that had been seized at the Convergence Center (all other
       materials remaining confiscated) was to allow demonstrators the minimum amount of
       political expression he believed was necessary to prevent them from resorting to violence.
       Ramsey said, "We let [them] have some of their puppets so they could have their day too,
       to be heard themselves. We have to give a little. Otherwise, if we take everything from
       them, it would turn violent." This open admission of both intent and action to suppress all
       but a minimum amount of expression manifests profound hostility to First Amendment
       rights. This statement is also an example of the District's efforts place the demonstrators in
       a false light and portray them as potentially violent.

143.   DC policymaker Mayor Anthony Williams stated his approval of the MPD's conduct on
       April 15, saying the arrests were "preventative" and "proactive."

144.   Metropolitan Police Officers maintained a widespread practice, known to and apparently

approved of by District policymakers, of removing or concealing their badge numbers and name tags. This widespread misconduct, in violation of police regulation, reflects the consciousness of guilt of the police force and evidences an intent to avoid accountability for the actions of the MPD, and supports the inference that defendants acted in knowing and intentional disregard for the rights of plaintiffs.

### Injury to Plaintiffs

145. By reason of defendants' actions, plaintiffs suffered substantial harm to their ability to convey their messages to the IMF-World Bank delegates.

146. By reason of defendants' actions, plaintiffs suffered substantial harm to their ability to convey their messages to other members of the public.

147. These harms are likely to recur in the future, as the annual meetings will continue to occur at the same location, and plaintiffs have already made definite plans to return to protest at the next annual meeting in 2001, and each subsequent year until the IMF and World Bank alter the policies to which plaintiffs object.

148. By reason of defendants' actions, plaintiffs suffered pecuniary loss because their property was seized and damaged or destroyed or not returned.

149. By reason of defendants' actions, plaintiffs suffered pecuniary loss because they were unable to sell or use for fund-raising the materials confiscated by the MPD, such as T-shirts and posters bearing political expressions.

150. By reason of defendants' excessive force, individual plaintiffs and class members suffered physical and emotional injury, pain and suffering, and related medical costs and expenses.

151. By reason of defendants' actions, individual plaintiffs and class members suffered loss of liberty and dignity and suffered physical and emotional pain and distress.

152. Organizational plaintiffs, and individual organizers, must divert resources from organizing and political education to address this fear and unconstitutional disruption, particularly because demonstrators are unlikely to participate in the organizations' activities where being

subjected to state-sponsored violence and other unconstitutional acts is a condition of, or risk of, the expression of political dissent.

153. Plaintiffs including Fifty Years is Enough have immediate and concrete plans to organize recurring and future demonstrations and acts of lawful speech and assembly in Washington, D.C. against the policies of the World Bank and the IMF. Plaintiffs' ability to carry out those plans has been and will continue to be diminished and frustrated unless defendants are enjoined from disrupting and unreasonably restricting plaintiffs' lawful activities.

## CLAIMS

## COUNT I
### Strategy to Disrupt First Amendment Activities

154. Defendants' strategy to disrupt plaintiffs' lawful political activities was a conspiracy to violate plaintiffs' First Amendment rights to assemble for peaceful political protest, to associate with others to engage in political expression, and to speak on public issues free of unreasonable Government interference.

155. All of defendants' acts alleged in this Complaint, regardless of whether independently actionable, were overt acts in furtherance of defendants' unconstitutional strategy.

156. Defendants' implementation of their disruption strategy deprived plaintiffs of the ability to convey their political messages among themselves through the free expression and undisrupted exchange of political ideas at the Convergence Center; to convey their message without disruption to the IMF, the World Bank, and the U.S. and foreign government policymakers at the IMF / World Bank meetings; and to convey their message without disruption to the public directly and through the media to other interested persons worldwide.

## Count II
### The Convergence Center

157. Defendants' actions in raiding and closing the Convergence Center, seizing and

confiscating the First Amendment material and other material and property therein, and refusing to allow plaintiffs access to all but a small amount of that material until after the World Bank - IMF meetings were over, violated plaintiffs' rights under the First Amendment and caused plaintiffs pecuniary loss.

## COUNT III
### Mass False Arrests on April 15 – Fourth Amendment

158.    Defendants' actions in arresting more than 600 demonstrators and bystanders at the Prison Industrial Complex protest on April 15, 2000, violated the Fourth Amendment rights of the persons arrested.

## COUNT IV
### Mass False Arrests on April 15 – First Amendment

159.    Defendants' actions in arresting more than 600 demonstrators and bystanders at the Prison Industrial Complex protest on April 15, 2000, violated the First Amendment rights of all plaintiffs.

## COUNT V
### Mass False Arrests on April 15 – False Arrest

160.    Defendants' actions in arresting and detaining more than 600 demonstrators and bystanders at the Prison Industrial Complex protest on April 15, 2000, violated the arrestees' right under District of Columbia law to be free of false arrest.

## COUNT VI
### Mass False Arrests on April 15 – False Imprisonment

161.    Defendants' actions in detaining on the street more than 600 plaintiffs at the "Prison Industrial Complex" protest on April 15, 2000 for approximately one hour prior to arrest constituted false imprisonment under District of Columbia law.

162.    Defendants' actions in detaining, after arrest, more than 600 demonstrators and bystanders at the "Prison Industrial Complex" protest on April 15, 2000, constituted false imprisonment under District of Columbia law.

## COUNT VII

**The Exclusion Zone**

163.    Defendants' actions in establishing and maintaining the Exclusion Zone violated plaintiffs' rights under the First Amendment.

## COUNT VIII
### Pop-Up Police Lines

164.    Defendants' actions in deploying pop-up police lines blocking access to public fora and making unlawful arrests violated plaintiffs' rights under the First and Fourth Amendments.

## COUNT IX
### Agent Provocateur

165.    Defendants' deployment of an agent provocateur violated plaintiffs' rights under the First Amendment.

## COUNT X
### Excessive Use of Force - Fourth Amendment

166.    Defendants' actions in using excessive force against certain individual plaintiffs violated the Fourth Amendment rights of those plaintiffs.

## COUNT XI
### Excessive Use of Force - First Amendment

167.    Defendants' actions in using excessive force against plaintiffs who were at the time lawfully exercising their First Amendment rights violated their First Amendment rights to engage in free speech without government interference.

168.    Defendants' actions in using excessive force against plaintiffs who were at the time lawfully exercising their First Amendment rights violated the First Amendment rights of all plaintiffs.

## COUNT XII
### Excessive Use of Force - Assault and Battery

169.    Defendants' actions in using excessive force against certain plaintiffs constituted assault and battery against those plaintiffs.

WHEREFORE, Plaintiffs request the following relief:

A.    Compensatory damages against the District of Columbia for violations of federal rights pursuant to 42 U.S.C. § 1983, in an amount appropriate to the proof adduced at trial;

B.    Compensatory damages against the unknown individual District of Columbia defendants sued in their individual capacities, for violations of federal rights, pursuant to 42 U.S.C. § 1983, in an amount appropriate to the proof adduced at trial;

C.    Compensatory damages against the District of Columbia defendants sued in their individual capacities, for violations of common law rights, in an amount appropriate to the proof adduced at trial;

D.    Compensatory damages against the District of Columbia, for violations of common law rights, pursuant to *respondeat superior*, in an amount appropriate to the proof adduced at trial;

E.    Compensatory damages against the federal defendants sued in their individual capacities, pursuant to <u>Bivens v. Six Unknown Agents</u>, 403 U.S. 388 (1971), in an amount appropriate to the proof adduced at trial;

F.    Punitive damages against each of the defendants sued in their individual capacities, in an amount appropriate to the proof adduced at trial;

G.    Entry of a declaratory judgment that defendants' disruption strategy violated plaintiffs' First Amendment rights;

H.    Entry of a declaratory judgment that the mass false arrests on April 15 constituted a violation of the First and Fourth Amendments;

I.    Entry of a declaratory judgment declaring the mass arrests on April 15, 2000 to have been unconstitutional, and to have constituted false arrest under District of Columbia law;

J.    Entry of a permanent and mandatory injunction compelling expungement of all arrest records related to the April 15 mass arrests, disclosure to plaintiffs of to whom such records have been disseminated or with whom they have been shared, the retrieval of all disseminated arrest records, and the establishment of a system for the immediate correction and retrieval of any disseminated records that are discovered in the future;

33

K.    Entry of a declaratory judgment that defendants' closing of the Convergence Center, and defendants' confiscation and refusal to release political items located therein, violated plaintiffs' First Amendment rights;

L.    Entry of a declaratory judgment that the Exclusion Zone constituted a violation of the First Amendment;

M.    Entry of a declaratory judgment that the pop-up police lines as deployed on April 17 constituted a violation of the First and Fourth Amendments;

N.    Entry of a declaratory judgment that the deployment of agents provocateur violated the First Amendment;

O.    Entry of a permanent injunction to enjoin and prohibit defendants from continuing their strategy of disrupting the lawful political protest activities of plaintiffs including through closure of meeting centers; seizure of literature and expressive materials; preemptive mass arrests; deployment of agents provocateur; unreasonable restrictions on the time, place and manner of free speech and assembly; or dissemination of misinformation;

P.    An award of their reasonable attorneys' fees, costs and expenses; and

Q.    Such other and further relief as to the Court may appear just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL ISSUES SO TRIABLE**


Respectfully submitted,


/s/
_____

Arthur B. Spitzer, D.C. Bar No. 235960
American Civil Liberties Union of the National Capital Area
1400 20th Street, N.W., #119
Washington, D.C. 20036
202/457-0800

/s/
_____

Mara Verheyden-Hilliard, D.C. Bar No. 450031
Carl Messineo, D.C. Bar No. 450033
Partnership for Civil Justice, Inc.

34

1901 Pennsylvania Ave., NW, Suite 607
Washington, D.C. 20006
202/530-5630

_____/s/_____
Zachary Jay Wolfe, Member of the Virginia Bar
National Vice President
National Lawyer's Guild
on Behalf of the Mass Defense Committee
D.C. application pending; supervision by Mara Verheyden-Hilliard
Partnership for Civil Justice Inc.
1901 Pennsylvania Ave. NW, Suite 607
Washington, DC 20006
202/530-5630

_____/s/_____
James R. Klimaski, D.C. Bar No. 243543
Law Offices of James R. Klimaski, P.C.
1899 L Street, N.W., Suite 1250
Washington, D.C. 20036-3805
202/296-5600

_____/s/_____
Daniel M. Schember, D.C. Bar No. 237180
Gaffney & Schember, P.C.
1666 Connecticut Avenue, N.W., Suite 225
Washington, D.C. 20009
202/328-2244


Counsel for Plaintiffs

35