IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| 50 YEARS IS ENOUGH, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | CIVIL CASE NO. 01-00811 |
| ) | |
| DISTRICT OF COLUMBIA, et al., ) | |
| ) | |
| Defendants. ) | |

DECLARATION OF JAMES W. RICE, II
FEDERAL BUREAU OF INVESTIGATION

I, James W. Rice II, pursuant to Title 28, United States Code, Section 1746, do declare and state as follows:

1. I am employed by the Federal Bureau of Investigation ("FBI") as a Special Agent and have been so employed since 1988. I am currently assigned as a Supervisory Special Agent to the Washington Field Office ("WFO"), Washington, D.C.

2. I have been the Supervisory Special Agent of the National Capital Response Squad ("NCRS") since its creation in January, 1998. Prior to that, I served as the Supervisory Special Agent of the Joint Terrorism Task Force at WFO. As the Supervisory Special Agent of the NCRS, my job duties and responsibilities include the supervision of domestic terrorism investigations and special event matters. The FBI defines a "special event" as a significant domestic or international event, occurrence, circumstance, contest, activity, or meeting which, by virtue of its profile or status, represents an attractive target for terrorist attack.

Fifty Years v. D.C. et al.,
Civil Action No. 01-0811 (PLF)
Exhibit 4 - Rice Decl.

3.  The Fourth Ministerial Conference of the International Monetary Fund/World Bank ("IMF/WB Conference"), which was held in Washington, D.C., from April 11, 2000, to April 17, 2000, was designated a "special event" by the FBI. I supervised the FBI's involvement in the joint federal, state and local law enforcement effort to counter potential acts of terrorism, threats of violence, injury to persons and property damage as a result of the events during the Conference. Consequently, I am familiar with all aspects of the FBI's response to the Conference and all statements made herein are based upon this personal knowledge and upon information made available to me in my official capacity.

4.  Presidential Decision Directive ("PDD") 39 divides terrorists incidents into two components: crisis management and consequence management. PDD-39, as well as PDD-62, designates the FBI as the lead federal agency for the crisis management response to threats or acts of domestic terrorism. The Federal Emergency Management Agency ("FEMA") is designated the lead federal agency for the consequence management response to such threats or acts. Essentially, this means that the FBI is has primary responsibility for preventing or responding to a terrorist threat or attack, and FEMA has primary responsibility for restoring essential government services and providing emergency relief for victims of terrorism. The FBI's role at the IMF/WB Conference was precisely that delegated by PDD-39 and PDD-62: to manage and coordinate the United States Government's response to all domestic acts or threats of terrorism.

5.  In preparation for the IMF/WB Conference, the FBI developed a Crisis Management Operations Plan. A copy of this document is attached to this declaration. This plan defined the role of the FBI as four-fold: 1) the prevention, response and investigation of any

terrorist-related incidents that affected the meeting and Conference participants; 2) the investigation of crimes against foreign officials and assault on federal officers and property; 3) the gathering of criminal intelligence related to the Conference and other related events; and 4) liaison with law enforcement and fire/rescue personnel. This role was consistent with the FBI's investigative jurisdiction and with the FBI's responsibilities under PDD-39 and PDD-62.

6. In order to carry out its role during the IMF/WB Conference, FBI resources were allocated to three components: reactive response, criminal intelligence gathering, and a command post operation. Each component had clearly defined roles and responsibilities. The reactive response component was responsible for facilitating a complete and rapid response to every suspicious package and every bomb or hazardous materials threat. The criminal intelligence gathering component was responsible for relaying information regarding the number, composition, and direction of large gatherings of protestors, any criminal activity observed, the location and description of suspicious persons, vehicles, and packages, and any observed arrests. The command post operation was responsible for relaying criminal intelligence to the Metropolitan Police Department (MPD) Command Information Center or to the federal agency with jurisdictional, investigative, or security responsibilities for the information.

7. The FBI was not responsible for, and did not directly participate in, establishing and maintaining security command and control, to include "crowd control," of the IMF/WB Conference area or anywhere else in the greater Washington, D.C. Metropolitan area. In fact, the U.S. Secret Service had primary responsibility for security command and control of the inner perimeter of the event. The MPD, and several other federal agencies had primary responsibility for security outside of the perimeter and the Washington Metropolitan area as a whole.

8. FBI Special Agents and other personnel assigned to work at the IMF/WB Conference were specifically instructed that they should not participate in security or crowd control. Instead, their role was to report any significant incidents to the MPD or the FBI's Command Post so that the appropriate agency could respond. FBI Special Agents were instructed to intervene if, and only if, the circumstances presented a possible federal crime under FBI investigative jurisdiction or were of such exigency that additional law enforcement assistance was needed. For example, the SAs were authorized to intervene if they witnessed a felony or violent misdemeanor in progress. These instructions were given to the Special Agents and other FBI personnel by me at numerous briefings, as well as by other FBI officials. These instructions were given not only to emphasize the FBI's delegated role during the IMF/WB Conference, but to protect FBI Special Agents who, in plainclothes, may not be identified by uniformed officers as law enforcement, thereby exposing themselves to potential harm if they intervened in confrontations between protesters and uniformed officers.

9. The Crisis Management Operations Plan strictly limited the FBI's role to providing criminal intelligence and specialized assets, such as bomb technicians, hazardous materials specialists and evidence technicians. A complete accounting of FBI assets that were on stand-by during the IMF/WB Conference can be found in the Crisis Management Operations Plan. As discussed above, the FBI did not directly respond to an incident unless the circumstances implicated possible FBI investigative jurisdiction. Thus, for example, between April 7, 2000, and April 17, 2000, FBI personnel responded to approximately 30 reactive response calls to suspicious packages, bomb threats, and one purported hazardous materials incident. Each of these responses was clearly consistent with the FBI's jurisdiction. By contrast,

the FBI did not intervene in any of the numerous instances of protesters incommoding throughout the city, but simply reported large protester movements to the Command Post so the appropriate agency with investigative jurisdiction could respond.

10. I have reviewed the allegations in plaintiffs' complaint and state that FBI personnel did not engage in any of the unlawful conduct attributed to its personnel. Specifically, FBI personnel did not arrest or detain a single person and did not seize or confiscate any property during the IMF/WB Conference protests. In addition, FBI personnel did not participate in the alleged raid or closure of the Convergence Center, did not participate in the creation or implementation of the alleged Exclusion Zone, and did not participate in the creation or deployment of the alleged "pop-up" police lines. Finally, FBI personnel did not engage in any physical confrontation with the protesters and did not discharge any chemical agent during the protests. FBI regulations require that a Special Agent report and document any arrest or seizure made, or any discharge of a chemical agent. Not a single such report was made by FBI personnel during or after the IMF/WB Conference. As the supervisor responsible for managing the FBI's involvement in the IMF/WB Conference, I would have been made personally aware of any FBI involvement in any of the conduct alleged by plaintiffs. I am not aware of any instances where FBI personnel were involved in the unlawful conduct alleged by plaintiffs.

11. The FBI maintained a Command Post Log ("Log") for the IMF/WB Conference. A copy of the Log entries from April 15-18, 2001, is attached to this declaration. The log represents a thorough and accurate accounting of the significant activities of FBI personnel during the IMF/WB Conference protests, and evidences the fact that FBI personnel strictly

adhered to the role generally defined by PDD-39 and PDD-62 and specifically set forth in the FBI's Crisis Management Operations Plan.

12. The FBI personnel in the Command Post who maintained the Log necessarily limited the amount of information and explanation provided for each entry. As a result, there are several entries which at first glance suggest that FBI personnel participated in activity inconsistent with the role I have explained in this declaration. These entries are highlighted below. Next to each, I have provided additional explanation that clarifies the actions recorded:

    a. "RS 290, 1000: FBI sent 15 Agents to assist with prisoner processing/handling at MPD."

To assist in the processing of persons arrested during the IMF/WB Conference, the FBI provided several mobile Integrated Automated Fingerprint Identification Systems ("IAFIS") stations. The IAFIS system dramatically reduces the lag time for fingerprint identification: instead of waiting several days for a response, fingerprint identification can be delivered in several hours. At the IMF/WB Conference, IAFIS allowed MPD to reduce the time needed to process each detainee. However, IAFIS is new and expensive technology that other law enforcement agencies do not use. For these reasons, the FBI provided its own personnel, to include some Special Agents, to assist the MPD with any difficulties in utilizing the IAFIS technology. Aside from providing technical assistance regarding IAFIS to the MPD, FBI personnel played no other role in the handling of the arrestees.

    b. "RS 306, 1144: FBI Aviation Unit is going up now that the weather is clear"; "RS 312, 1245: FBI Aviation reports that the heaviest volume of protesters are located at E & 17th and New York & 18th".

6

Two flights involving FBI aviation assets were conducted on April 16, 2000. The duration of the flights was for approximately four and two hours, respectively. The role of the FBI pilots was to gather information about events on the ground and to relay this information to FBI personnel on the ground. The pilots were primarily concerned with observing and reporting the number, composition, and direction of large gatherings of protestors, and any observed criminal activity. The FBI personnel on the ground receiving this information would then determine whether this information should be passed on to the District of Columbia Metropolitan Police Department or to another federal agency, or whether FBI intervention was appropriate. As I stated earlier in this declaration, FBI personnel were instructed not to intervene unless the circumstances presented a possible federal crime under FBI investigative jurisdiction or exigent circumstances existed. The use of FBI aviation assets in this manner was consistent with the FBI's designated role for this conference, and with the FBI's responsibilities under PDD-39 and PDD-62.

**c.** "RS 473, 1618: SA Gardner and SA Rosenthal reported that they are assisting MPD in the search of 1421 Columbia Road, NW, the site of the pirate radio station. They were instructed, per SSA Perren, to NOT assist with the search."

Approximately 20 FBI Special Agents were partnered with MPD intelligence personnel for the IMF/WB Conference. This arrangement helped facilitate communication between the FBI and the MPD, as each pair had an FBI radio and an MPD radio. However, as I explained earlier in this declaration, FBI Special Agents were specifically instructed to not assist in any arrest, detention, search or seizure unless the circumstances indicated possible federal criminal activity falling under the FBI's investigative jurisdiction. Where, as here, such circumstances are

absent, the Special Agents were instructed by their supervisor to not assist with the search, and in fact, SAs Gardner and Rosenthal did not assist.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _eleventh_ day of _December_, 2001.

*[signature]*
James W. Rice, II
Supervisory Special Agent
Federal Bureau of Investigation
Washington Field Office
Washington, D.C.