# Transcript of the Testimony of **James W. Rice II**

**Date:** August 9, 2005
**Volume:** 1

**Case:** Alliance For Global Justice et al., v. District Of Columbia, et al.

Printed On: August 9, 2005

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

GOVERNMENT
EXHIBIT
Reply - 1

James W. Rice II - August 9, 2005
Alliance For Global Justice et al., v. District Of Columbia, et al.

Page 1

1              PARTNERSHIP FOR CIVIL JUSTICE

2

3

4    - - - - - - - - - - - - - - - - - - x

5    ALLIANCE FOR GLOBAL JUSTICE et al., : Case No.

6              v.                    : 01-0811 (PLF)

7    DISTRICT OF COLUMBIA, et al.       :

8    - - - - - - - - - - - - - - - - - - x

9

10

11            DEPOSITION OF JAMES W. RICE, II

12

13

14                          Washington, DC

15                          Wednesday, August 3, 2005

16

17

18   REPORTED BY:

19        ANNE G. BLOOM

20

21

22

James W. Rice II - August 9, 2005
Alliance For Global Justice et al., v. District Of Columbia, et al.

Page 42

1  individuals assigned to the JTTF, they do have a
2  parent organization and at any time can get a tasking
3  from that parent organization. It does not free them
4  from that responsibility.
5      Q    To your knowledge, to the FBI's knowledge,
6  did Detective Louryk get a tasking from his parent
7  organization, which I understand to be the Metro
8  Transit Police, to engage in tasks that were related
9  to the IMF World Bank April 2000 meetings?
10     A    Not that I know of, but I may not have
11 been included in any of those taskings.
12     Q    With respect to Detective Louryk's actions
13 and responsibilities during the period of April 15th
14 through April 17th of 2000, inclusive, is it your
15 understanding that he was full-time receiving his
16 responsibilities through the JTTF?
17     A    Yes, sir, I believe that's correct.
18     Q    And in so doing he was full-time receiving
19 his assignment from the federal government?
20     A    Yes, sir, I believe that's correct.
21     Q    Were you aware of any conduct that
22 Detective Louryk engaged in between April 15th and

Page 43

1  17th?
2          MR. SMITH: Objection, form. You can
3  answer.
4          THE WITNESS: It's such a broad question,
5  I don't -- could you narrow it down for me?
6          BY MR. MESSINEO:
7      Q    With respect to the period of April 15th
8  to 17th -- and if in response, in your answers, you
9  want to distinguish between days within that period
10 that I've put together as a group, go right ahead and
11 then I'll put my questions to you in that way.
12     A    Okay.
13     Q    During the period of April 15th to 17th,
14 what were Detective Louryk's assignments as they
15 related to the IMF World Bank demonstrations?
16          MR. SMITH: Objection, form as to
17 demonstrations. You can answer.
18          THE WITNESS: The assignments that I gave
19 him, along with the other members of the JTTF, were
20 simply as members of the intel or observing teams:
21 again, to stay on the periphery of the on-going
22 events and to report back any suspicious activity or

Page 44

1  any threats that they saw, anything that they deemed
2  that the command post should know about.
3          BY MR. MESSINEO:
4      Q    Did you ever meet Detective Louryk in
5  person?
6      A    Yes, sir.
7      Q    And would you recognize him visually?
8      A    Yes, sir.
9      Q    So you've had ample opportunity to
10 familiarize yourself with his general appearance as
11 it was back in April 2000?
12     A    Yes, sir.
13          MR. MESSINEO: This is a series of photos
14 that we'll mark as Exhibit 2. Please take a moment
15 and look at each of the four pages to Exhibit 2.
16              (The document was marked
17              Rice Deposition Exhibits
18              2A, 2B, 2C and 2D for
19              identification.)
20     (Handing document to the witness.)
21          BY MR. MESSINEO:
22     Q    Please take a look at these four pages of

Page 45

1  Exhibit 2 that in the right bottom corner are marked
2  respectively A, B, C and D, and let me know when
3  you've taken a look at them.
4          (Witness reviewing document.)
5      A    Yes, sir.
6      Q    Is Detective Bruce Louryk depicted in any
7  of these photographs?
8      A    Yes, sir, I believe so.
9      Q    Can you please identify -- let's go
10 through them page by page. On page A of Exhibit 2 --
11 and there happens to be three images here -- is
12 Detective Louryk depicted on this page?
13     A    He's depicted in the leftmost photograph.
14 I'm sure about that, I'm sure that's Bruce in that
15 picture. I'm not 100 percent sure that's the same
16 person in the other picture. The one on the far
17 right is just so bad I just can't tell if that's him
18 or not. The one in the middle, though, the hair is
19 different and it looks like the shape of the face is
20 different. It could well be Detective Louryk, but I
21 tell you, if this was a photo spread, I'm not sure I
22 would pick him out in that particular picture. But

12 (Pages 42 to 45)

James W. Rice II - August 9, 2005
Alliance For Global Justice et al., v. District Of Columbia, et al.

Page 46

1 it could well be. But the one on the far left is
2 Bruce Louryk.
3     Q    It would be accurate to say that in the
4 photo on the far left and the one in the middle –
5 and the one in the middle it appears that he is
6 actually – the person depicted is engaged in some
7 form of motion?
8     A    Yes.
9        MR. SMITH: Objection, foundation. You
10 can answer.
11        THE WITNESS: It looks like a picture
12 taken off of a video.
13        BY MR. MESSINEO:
14    Q    Let's take a look at page B to that
15 exhibit. Do you recognize that individual?
16    A    That looks like Bruce Louryk.
17    Q    Page C?
18    A    Yes, sir, that looks like the first
19 picture we talked about on the far left. That
20 appears to be Bruce Louryk.
21    Q    And page D?
22    A    That's the same picture as on the first

Page 47

1 page and actually it's worse.
2     Q    I would agree with you in both respects.
3        Did Detective Louryk engage in any use of
4 force in connection with – during the period of
5 April 15th to 17th in connection with his IMF World
6 Bank related responsibilities?
7     A    Not that I was aware of or any allegation
8 thereof until I talked to the U.S. Attorney.
9     Q    When was the first time that you became
10 aware that Detective Louryk was alleged to have
11 engaged in assaultive conduct?
12    A    Monday of this week the first time that we
13 had a chance to meet. It would have been August 1st.
14    Q    What attempts have you made, if any, since
15 receiving knowledge or awareness of this allegation,
16 to communicate with Detective Louryk?
17    A    In the presence of the Assistant United
18 States Attorney, a conference call was placed to Mr.
19 Louryk wherein he was requested to contact or to get
20 with the U.S. Attorney's Office and meet. That's the
21 only time I have actually spoken to Bruce since he
22 retired a year-plus ago.

Page 48

1     Q    Where is he physically located now, to
2 your knowledge?
3     A    I'm pretty sure he, when he retired from
4 the Metro Transit Police Department, that he was
5 hired by one of the agencies under homeland security.
6 But I'm not sure if he was hired by the TSA or who,
7 but I believe it is a homeland security agency.
8     Q    Is it your understanding that Detective
9 Louryk -- and I don't know if that's his continued
10 rank, but if Detective Louryk – that he is currently
11 employed by the federal government?
12    A    I believe he is, yes, sir.
13    Q    Do you know, is he employed in the
14 Washington, D.C. area, to your knowledge?
15    A    Yes, sir, I think so.
16    Q    And the agencies you believed he might be
17 employed with are TSA and Homeland Security?
18    A    Homeland Security's the department and TSA
19 is an agency therein, and I believe that is where
20 someone had said that he was getting a retirement job
21 at when he left. So I'm assume that's where he still
22 is.

Page 49

1     Q    Has Detective Louryk agreed to present
2 himself for the purpose of meeting about this subject
3 matter?
4        MR. SMITH: Objection, foundation.
5        THE WITNESS: Not to me, no, sir.
6        BY MR. MESSINEO:
7     Q    You were on the conference call, correct?
8     A    Yes, sir.
9     Q    You heard the conference call?
10    A    Yes, sir.
11    Q    What was said?
12    A    He said that he would check with his
13 counsel and call the U.S. Attorney back.
14    Q    What was the first thing that was said to
15 him during the call?
16    A    I believe the first thing was, Mr. Louryk,
17 this is AUSA Peter Smith from the Washington office
18 of the U.S. Attorney's Office.
19    Q    And what happened next?
20    A    He was on his cell phone. He said can I
21 call you back on a hard line. Approximately two
22 minutes later he called back. He said this is in

13 (Pages 46 to 49)

James W. Rice II - August 9, 2005
Alliance For Global Justice et al., v. District Of Columbia, et al.

Page 54

1    Q    Have you read the complaint, sir?
2    A    Yes, sir.
3    Q    And in the course of the complaint, the
4    complaint proceedings, you have been asked to collect
5    information on behalf of the FBI, is that correct?
6    A    Yes, sir.
7    Q    And that was for the purpose of producing
8    it and disclosing it in the course of – ordinary
9    course of litigation, correct, sir?
10    A    Yes, sir.
11    Q    Okay. What efforts have been undertaken
12    by you to ascertain whether any FBI personnel,
13    including those who were deputized, engaged in any
14    alleged use of force against Mr. Fish?
15        MR. SMITH: Same objection, and the form
16    objection is that the FBI deputized people.
17        MR. MESSINEO: I'm sorry, Department of
18    Justice. Are you comfortable with that?
19        MR. SMITH: Same objection.
20        BY MR. MESSINEO:
21    Q    Who deputized Bruce Louryk?
22    A    The U.S. Marshal Service.

Page 55

1    Q    Which is a component of the Department of
2    Justice?
3    A    Yes, sir.
4    Q    All right. And we've established the FBI
5    is also.
6    A    Yes, sir.
7    Q    And are you aware that the Attorney
8    General is identified in his official capacity as a
9    defendant in this litigation?
10    A    Yes, sir.
11    Q    The Attorney General's responsibility, as
12    you're understanding, encompasses the Department of
13    Justice, correct?
14    A    Yes, sir.
15    Q    What efforts, if any, have been made to
16    ascertain whether anyone deputized within the
17    Department of Justice engaged in any use of force
18    related to Robert Fish in connection with the April
19    2000 IMF World Bank demonstrations?
20    A    When we were notified by our Office of
21    General Counsel that a suit had been filed and that
22    discovery motions were in process, we immediately set

Page 56

1    out to identify any document or file that we would
2    have that would pertain to this matter and we also
3    queried all the squads that would have been involved
4    in this matter -- including the specialty teams such
5    as SWAT and crime scene teams and all of them -- for
6    any information, records, documents that they would
7    have pertaining to this event. We did not limit the
8    scope of our request to any allegations, we just said
9    everything everybody has related to the event, the
10    Chief Division Counsel office wants it produced for
11    them and delivered to them. That would also include
12    verbal conversations with the members of the squad.
13        As more things would come up, Chief
14    Division Counsel would come back and say ask
15    everybody if, and one of those would have been or was
16    did anybody arrest anybody, did anybody put their
17    hands on anybody, did anybody process anybody,
18    interrogate, interview anybody, transport. So all of
19    those questions were asked.
20    Q    At the time that those questions were
21    asked, was Detective Louryk still a member of the
22    WJTTF?

Page 57

1    A    I don't believe so.
2    Q    At this time those questions were asked,
3    were efforts made to make inquiries, similar inquires
4    to those persons who were, at the time of the events,
5    working with the JTTF but had since moved on, such as
6    Detective Louryk?
7    A    Not to my knowledge.
8    Q    When was the first time it came to the
9    FBI's -- well, let me.
10        If you look at -- withdraw that -- and
11    just go look at Exhibit 2A.
12    A    Yes, sir.
13    Q    As is reflected on here, this is a
14    printout from a website, it's identified on the top
15    left as dc.indymedia.
16    A    Uh-huh.
17    Q    Are you familiar with the indymedia
18    website?
19    A    No, sir.
20    Q    Is the FBI familiar with the indymedia
21    website?
22    A    Probably our analytical people would be.

15 (Pages 54 to 57)

James W. Rice II - August 9, 2005
Alliance For Global Justice et al., v. District Of Columbia, et al.

Page 66

1    MR. SMITH: Objection, foundation. You
2  can answer.
3        THE WITNESS: I know of nothing we haven't
4  produced in relation to anything related to this.
5        BY MR. MESSINEO:
6    Q    So the FBI's position then -- because I
7  have -- you're the spokesperson of the FBI for this
8  issue, do you agree with that?
9    A    For the issue of civil rights --
10   Q    No, no, no.
11       MR. SMITH: Objection to the extent calls
12  for a legal conclusion.
13       BY MR. MESSINEO:
14   Q    No, no. Actually specifically to the
15  description I just read to you about facts, events,
16  policies, et cetera, as pertains specifically to the
17  use of force against Robert Fish. You're the
18  spokesperson for the FBI to address that subject
19  matter, correct?
20       MR. SMITH: With respect to the topic
21  area?
22       THE WITNESS: And to the best of my

Page 67

1  knowledge, the FBI has produced everything in its
2  possession related to this.
3        BY MR. MESSINEO:
4    Q    And is it not the FBI's obligation to
5  acquire all information that is reasonably accessible
6  to it regarding this subject matter?
7        MR. SMITH: Objection, calls for a legal
8  conclusion.
9        BY MR. MESSINEO:
10   Q    Do you understand that to have been the
11  FBI's obligation with respect to this subject matter?
12       MR. SMITH: At that point, I'm going to
13  object. It calls for a legal conclusion and also is
14  something one would address -- discovery obligations
15  is something one would address to counsel, it's not
16  something a 30(b)(6) witness would be able to opine
17  about, what the FBI's discovery obligations are.
18  That's something that would ultimately be determined
19  by the court.
20       MR. MESSINEO: Right. And what I'm
21  seeking to establish here is factually and
22  foundationally that there is a deficiency with

Page 68

1  respect to the failure of the FBI to exhaust all
2  reasonable sources of information that pertain to
3  this subject matter in the production of this witness
4  on this particular issue. So I understand the
5  objection to legal conclusion, but I need to ask --
6  and I'm going to continue to ask what you understood
7  your responsibilities were, what steps you did take,
8  so the record can be clear what has been done and
9  what has not been done.
10       BY MR. MESSINEO:
11   Q    What did you understand your
12  responsibilities were in terms of collecting
13  information and gathering information reasonably
14  accessible to the FBI with respect to that -- this
15  topic matter that relates to allegations of use of
16  force involving Robert Fish?
17       MR. SMITH: Same objections as to that
18  question. I think appropriate questions would be
19  what did the FBI do?
20       MR. MESSINEO: Well that would be the next
21  one.
22       BY MR. MESSINEO:

Page 69

1    Q    But I want to know what you thought you
2  were supposed to do.
3        MR. SMITH: Same objection. You can
4  answer.
5        THE WITNESS: Produce everything in our
6  possession that we had that related to this event.
7  However, as I understand your question, it sounds
8  like you're asking me did we conduct an independent
9  investigation into other agencies or outside of what
10  the FBI possessed. And I believe that would be
11  outside the scope of what I can do. I can produce
12  everything that we have, however, I can't go produce
13  everything that somebody else in the world might
14  have. That would cause me to be conducting an
15  investigation, say, into, let's say the Metropolitan
16  Transit Police department or the Metropolitan Police
17  Department or Secret Service. And I don't believe
18  that is what is requested in that discovery request.
19       BY MR. MESSINEO:
20   Q    Let me be more specific, because the way
21  you characterized it is broader than actually what
22  I'm asking, so there could be a misunderstanding.

18 (Pages 66 to 69)

James W. Rice II - August 9, 2005
Alliance For Global Justice et al., v. District Of Columbia, et al.

Page 70

1  What efforts have you done to make — you have the
2  capability, do you not, to be in touch with, to be in
3  communication with Detective Bruce Louryk, is that
4  correct?
5      A   I don't know. I could go through
6  Metropolitan Transit Police department to see if they
7  do. I don't have the ability to contact him.
8      Q   So you don't have his telephone number
9  committed to memory, correct?
10     A   No.
11     Q   You don't know what his telephone number
12  is, correct?
13     A   Correct.
14     Q   But you have easy access to resources
15  which would disclose to you what his telephone number
16  is, is that also correct?
17         MR. SMITH: Objection, foundation, form.
18  You can answer.
19         THE WITNESS: Yes.
20         BY MR. MESSINEO:
21     Q   And you have not gone through the steps to
22  easily access and determine what his telephone number

Page 71

1  is?
2      A   No, I have not tried to contact Detective
3  Louryk.
4      Q   And you — it's conceded that Detective
5  Louryk, during the dates in question, specifically
6  April 17th, 2000, was working full-time with the
7  WJTTF, is that accurate?
8         MR. SMITH: Objection to the extent it
9  calls for a legal conclusion. You can answer.
10         THE WITNESS: Yes, sir.
11         BY MR. MESSINEO:
12     Q   And he was getting his work assignments,
13  in fact, from you directly?
14     A   From the JTTF, no, sir.
15     Q   For April 17th, 2000, was he not —
16     A   April 17th — April 15th to 17th, yes,
17  sir.
18     Q   For that period of time he was getting his
19  directions -- directives from you, correct, sir?
20     A   Correct.
21     Q   And that's because you were the, what is
22  that, supervisor in charge, is that what you're

Page 72

1  called?
2      A   Yes, sir.
3      Q   If I asked to go get his telephone number
4  to call him and to have ascertained what this
5  individual who was taking his employment direction
6  from you was doing back on April 17th, 2000, would
7  you go and do it?
8         MR. SMITH: Objection, mischaracterizes
9  prior testimony as to the employment relation, calls
10  for a legal conclusion, foundation, and again, this
11  gets back to what discovery obligations the FBI
12  ultimately has and that's something that would be
13  addressed through counsel and not through a 30(b)(6)
14  witness or through Special Agent Rice as a fact
15  witness. That's something we can discuss between
16  attorneys. I don't think that Special Agent Rice in
17  the position, at the behest of opposing counsel, to
18  contact a third party and provide information. But
19  that's the objection.
20         BY MR. MESSINEO:
21     Q   So to leave the factual foundational
22  questions quite clear on the record, you have the

Page 73

1  capability to access resources that are easily
2  accessible to you to determine the contact
3  information for Detective Louryk, correct?
4      A   Yes, sir.
5      Q   You have not done so to date?
6      A   No, sir.
7      Q   That's because you believe that is outside
8  of your responsibilities in responding to whatever
9  discovery obligations you have?
10     A   Yes, sir.
11         MR. MESSINEO: Allow me to register my
12  objection to the deficiency of this witness. For the
13  record the failure of the FBI to take all measures
14  that are reasonable and practical within its ability
15  to access information to produce comprehensive
16  deponent — or deponent comprehensive knowledge that
17  is comprehensive to the FBI's collective knowledge as
18  to item number 18 on the notice of deposition.
19         BY MR. MESSINEO:
20     Q   Did Detective Louryk use force against
21  Robert Fish?
22     A   I have no idea.

19 (Pages 70 to 73)